Case number 22-1097 et al. Ali Hamza Ahmad al Bahlul v. United States of America. Mr. Parody v. Petitioner. Mr. Parody v. Pompant. Mr. Parody, welcome, whenever you're ready. Thank you, Your Honor. Judge Katz, Judge Antel, Judge Hammond, and may it please the Court. I'd like to make two brief points this morning and then obviously answer any questions you might have. The first being that under this Court's prior decision and the Supreme Court's intervening decision in United States v. Arthrex, the convening authority for military commissions is a principal officer and must be appointed by the President and confirmed by the Senate. Under this Court's prior holding, the convening authority in this case was appointed as an inferior officer. Despite the fact that she exercised unreviewable authority to make dispositive decisions and executive judicial decisions, what in Arthrex is called a decision to bind the executive branch in the application of executive power. Arthrex resolves this case and the respondent remains free to prosecute Petitioner before a appropriately convened military commission. Second, a military jury sentenced Petitioner on the basis of three novel charges to life in prison. This Court unanimously vacated two of those charges, including the central charge around which the prosecution built this case, on the grounds that those were not crimes. The CMCR affirmed a sentence of life without parole, a more serious sentence, a graver sentence than was imposed by the members by applying the wrong standard of review, making erroneous factual inferences, relying on admissible evidence, and most seriously, making inferences and speculations about how prosecutors could have brought a case for conspiracy alone. Let's just start with the appointments issue. This Court rejected that argument, applying Edmund. So that's law of the case, it's law of the circuit. You need to show not just close question, you need to show that Arthrex eviscerated our decision. And that seems a little hard since Arthrex on its face, the concluding paragraph, says we reaffirm and apply the rule from Edmund, which is the rule we applied. That's correct, but what Arthrex did eviscerate was this Court's interpretation of Edmund. Edmund identified various factors that would make an individual a principal versus an inferior officer. This Court had looked to those three factors essentially as cumulative, so that an officer could make unreviewable decisions so long as they were subject to certain removal provisions or rulemaking by the Secretary of Defense in this case. What Arthrex said was that in the context of adjudications, the ability to make final decisions, final unreviewable decisions, is dispositive, is sufficient to make a principal officer a principal officer because what had been significant, what Chief Justice Roberts actually says in Arthrex, what was significant in Edmund, what was absent in Arthrex, and what is absent here, is the ability of the executive branch to challenge, reverse, review any decision that the convening authority makes. What decision could she have made that would be final, unreviewable, and adverse to your client?  Well, in this case, one of the things that Petitioner's trial counsel asked the convening authority to do was to vacate the charges on the grounds that he hadn't been allowed to represent himself in the manner he had desired, and she rejected that argument. And so the rejection of that argument, the denial of a benefit, is a harm. Yeah, but that argument about a garden variety trial error, which is reviewable by the CMCR. It's not because the convening authority makes a decision on whether or not to affirm or overturn a judgment of a military commission in her sole discretion and prerogative. She's able to make judgments essentially purely based on policy, consequential decisions. If she enters judgment on the verdict, you have an appeal right to the CMCR with perfectly conventional standards of review to make whatever arguments you want. With respect to legal error, but I think for Appointments Clause purposes, that actually makes the problem worse, because the Appointments Clause is concerned about ensuring that the president is able to ensure the laws are faithfully executed and be able to ensure that executive branch decisions are made by accountable officers, that the individual making a decision is identifiable and accountable ultimately to the people. And here, the executive branch has no way of countermanding any decision the convening authority makes, for example, to overturn a verdict. This court identified three unreviewable powers that the convening authority exercises, including overturning a verdict. The ones that are unreviewable are powers to do things favorable to your client, to grant what seems to be the rough equivalent of a judgment of acquittal, to downgrade a conviction to a lesser included offense, to lower the sentence but not raise it. The error here, if I may, Your Honor, the error here is that the convening authority was improperly appointed to deprive the military commission of jurisdiction. The question is whether she's an inferior officer. That's correct. Well, in this court, hell, she was an inferior officer. And the problem is that under Arthrex, to the extent an executive agent has the ability to make final unreviewable decisions in favor of a petitioner, in favor of the government, ultimately is irrelevant so long as that power is unreviewable. And if they have the power to make an unreviewable decision, to use Chief Justice Roberts' words, to put something in the books that a superior officer in the executive branch can't erase, well, then that person has to be a principal officer. And I don't think there's probably more significant a decision, more unreviewable decision, than the ability to overturn a verdict. That's what courts of appeals do. And in Arthrex, the very issue is that one of the powers given to administrative patent judges was the power to overturn a patent without review in the executive branch. And if the power to overturn a patent is sufficient to make someone a principal officer, if that decision is not reviewable, then certainly the power to overturn a verdict, in a capital case even, is sufficient enough, consequential enough, to use this court's language, to make that person a principal officer. If we accepted your reading of Arthrex, we would then have a question of remedy. And Arthrex tells us when we have this sort of problem, which is someone appointed as if an inferior officer is given too many powers to function as an inferior officer, Arthrex says we don't blow up the whole scheme. We excise the impermissible powers. That's right. So what we would do is we would either eliminate, declare that she didn't have the authority to do all these things favorable to your client, or we would declare that she could do those things and then the Secretary of Defense could review that. But all of that is harmless error, because she didn't do any of that anyway. Two answers on that, just if I might. First of all, the improper appointment of the convening authority is jurisdictional error. It deprives the military commission of jurisdiction. That is a two-step thing there. You say she has a problem with her jurisdiction, and then you say that deprives the military commission of jurisdiction. If you have a commission that is sworn in and has been de facto appointed before they were sworn in, would they be void of their decision, or would it be voidable if they were? It would be void. This is a longstanding principle of military law that goes back literally centuries. I can provide a court of 28-J letter with a list of cases involving the improper appointment of convening authorities where the improper appointment is incredibly technical oftentimes. It's sometimes even as much as the memo didn't specifically give a convening authority a general court-martial convening authority as opposed to a special court-martial convening authority. So just as a matter of longstanding principle of military law, the convening authority, because everything turns on the convening authority of sole discretion and prerogative, from the creation of the court to the finalization of its judgment, the improper appointment of a convening authority for any reason is a jurisdictional defect. But if I can get, I think, more to the crux of what I think your Honor's question is, do we have to blow up the whole system? Absolutely not. For the vast majority of the military commission's history in Guantanamo, the convening authority has been a presidential appointee confirmed by the Senate. It's just that in two instances, and we list the convening authorities on page, I think it's 38, of our appendix. In two instances, the Secretary of Defense designated essentially SES hires that had been brought into the government as civilian employees hired by the Deputy Secretary of Defense, and then designated that individual to be convening authority. But if the Secretary of Defense wanted to be the convening authority, if the Deputy Secretary of Defense wanted to be the convening authority as it was, as a number of other military and civilian officials who haven't been properly appointed wanted to be convening authority, that's fine. There's no reason to touch the statute. And just to give you, again, a sense of what the power of the convening authority is all about and how easy this is to comply with, every military officer above the grade of lieutenant colonel or commander in the Navy is appointed by the president, confirmed by the Senate. And if you go back in history, as the government often does in these cases, to say who were the convening authorities during World War II, it's Dwight Eisenhower, Douglas MacArthur, General Steyer in the Philippines. In fact, FDR was the convening authority in the Ex parte hearing case, and it wasn't just a pro forma position. He actually had the record of trial from here sent to him in Hyde Park so that he could review and ultimately approve it. So, you know, this is a very, very consequential power. And under Arthrex, it just can't be given to someone who is an interior officer. If we can just go back to Arthrex for a minute. It seems that for us to rule in your favor, we would have to accept your interpretation of Arthrex. You say that Arthrex is completely at odds with the prior ruling on this issue. In this case, yes. In this case, yes. And so you you're saying that under Arthrex, if the convening authority can exercise final decision making authority on behalf of the executive branch or anything, not just the things in this case, then that officer has to be a principal officer, not an inferior officer. And so I think I agree with Judge Katz that you have some hurdles here, because in Arthrex, the Supreme Court applied Edmunds, said it was applying Edmunds, looked at not just that one factor, but all three factors said, and I quote, we are not setting forth an exclusive criterion for distinguishing between principal and inferior officers. Whereas I think you are advocating an exclusive criterion, which is if they can exercise that final decision making authority. And in Arthrex, it wasn't the case that that was the only factor. There was also the factor about removability, because in Arthrex that was removability for cause, whereas here it's at will. So I think that there are a number of hurdles for us to agree with you that Arthrex must be applied in the way that you are advocating. I'd like to reflect the disagreement. I usually be about to cut into my time, though. We'll give you time. Thank you. So specifically what Arthrex held was that when the power is to make a final decision, a consequential final decision, not just any decision, but consequential decisions, and this court already identified three of those that the committing authority makes, that when those consequential decisions are unreviewable, that that is a sufficient condition to make an officer, that is a sufficient condition to make an individual a principal officer. So where are the words in Arthrex that specifically say that? I would like to go to the part at the end of I think part two of the court's opinion where it says we hold, and the court says we hold. Now, again, they're talking specifically about the APJs, and so some of the language references the powers of the APJs. It basically says that the power of the APJs to make final binding decisions on behalf of the United States to bind the executive branch in the application of executive power in a particular way must be exercised by a principal officer, and these individuals were not appointed as principal officers. But that language was also in Edmund, and it doesn't say that we're excluding the other factors of Edmund. No, but, again, there are different ways in which there are different reasons someone might be a principal officer. If they're an agency head, they might have to be a principal officer, even though they have nothing to do with adjudications. Edmund was simply articulating various ways. But if I can point to removability, even if you accept that these factors still bear some weight, again, what Arthrex says is that removability matters to these, and ultimately Chief Justice Roberts didn't even go that far. But he said even if removability were to matter, it matters because it allows essentially superior properties within the executive branch to control and direct specific decisions. And we know under Section 949B that's the one reason you can't threaten to remove a convening authority or to remove a convening authority is to influence a particular decision. This is a longstanding principle called unlawful influence in military law. The Court of Appeals for the Armed Forces decision in United States v. Boyce deals specifically with essentially trying to muscle a convening authority out in order to influence their… But it's exactly the same as in Edmund. That was the same type of removability provision in Edmund as here. Absolutely, but, again, what was important, and this is, I think, about page 665 of Edmund, where the court says, and this is ultimately what Chief Justice Roberts says was significant about Edmund, there was literally no decision that a Court of Criminal Appeals judge could make that was not reviewable by the executive branch, either by virtue of a direct appeal from a power the government does not have with respect to the actions of the convening authority or to the extent they acted in administrative ways. Then things like the judge advocate's supervisory power over their administrative functions allow them to be under the direct supervision and control of the judge advocate. But here, again, I don't think this is an over-reading. I think this is a fairly straightforward reading of Arthrex. To the extent the convening authority is given the power to make unreviewable final decisions that are dispositive to new adjudications, this Court already held that she has that power. The fact that she might be removable for some other reasons that have nothing to do with her decision or the fact that she might generally be subject to general administrative supervision is just not sufficient to overcome that exercise of sovereign power that only can be entrusted to principal officers. And so to the extent there was, I think, ambiguity that this Court relied upon about whether or not these three factors essentially offset each other and can work together so that someone with unreviewable authority can be an inferior officer so long as they might be removable. To the extent the removability affected their decisions and could be used to affect their decisions, perhaps that's still good law. But Arthrex says ultimately it's the decision, not the decision-maker, that must be supervised because that ensures that the executive branch is accountable for the decisions executive officers are making. Again, I just point to the significance of being able to overturn a verdict. The convening authority could overturn the verdict in the September 11th case, decide that the September 11th case doesn't warrant the death penalty. No, I understand all that and I understand your position, but I'm still not convinced that Arthrex elevates the finality of decision-making over all the other elements and to the exclusion of those other elements and it has to be read in the way that you are advocating. We would have to hold that Arthrex must be read in the way that you are advocating in order to rule in your favor. Even if it's not clear that they're ruling that way, I don't think we can rule in your favor. I disagree on two points. One is all this Court has to hold is that Arthrex clarified that when it's adjudicative powers being exercised by executive branch officials, there must be some kind of view. Right, we would have to interpret Arthrex the way you're interpreting it in order to rule in your favor. And even if we think that it's not clear whether Arthrex says that or not, we don't rule in your favor. I disagree on law of the case grounds because, again, law of the case can't be substituted for law of the land. And the real question is would this Court have a balance? It's the law of the circuit grounds, though. We have a holding that she was permissibly appointed as an inferior officer. There are two solutions to that. One would just be seeking an iron footnote to just recognize that Arthrex at least changed the law on how the Appointments Clause applies in these kinds of contexts. But more specifically, in a law of the case situation, the fact that an intervening Supreme Court decision changes the foundation of the Court's ruling. In that case, we're still on direct appeal. This isn't a collateral attack or this is not a different defendant. We're still on direct appeal. To the extent that a Supreme Court decision undermines the rationale that this Court used to reach a particular conclusion, law of the case must yield to the law of the Supreme Court. But if we have a decision that's directly on point, and there's a later Supreme Court decision that might or might not impact things, we don't just apply the Supreme Court decision de novo. We ask, is there sufficient basis for us to not follow one of our precedents? Yes. And I think what Judge Pan was getting at, and I suggested earlier, is we have to find more than just a litigable issue about how Arthrex is best read. Sure. We think this is pretty straightforward. We think our case is really on all fours with Arthrex. So if we disagree, you lose? Well, no, but even if you disagree, again, law of the case principles do have to yield. I think the best case on this, just in terms of sort of a similar situation, was a decision from then-Judge Gorsuch on the Tenth Circuit, a case of the United States v. McKay. We can provide the citation to the Court in a 28-J letter. But there, a defendant had essentially challenged on sufficiency of the evidence grounds whether or not their drug trafficking had resulted in death. That argument was rejected. But for different reasons, the case had been remanded for resentencing. While that case was pending on resentencing, the Supreme Court decided to urge, which significantly narrowed what it means to result in death. And Justice Gorsuch said, no, the law of the case has to yield to the law of the land. We have to apply the new standard of governing when, in that case, something goes wrong. I don't think we're disagreeing with you that the law of the case yields to the law of the land. I think that we have a dispute about what the law of the land is. And whether it clearly has changed. And unless we squarely agree with you that it has changed in the way that you say, I don't think we can rule in your favor. So I would say the best evidence that it has squarely changed, and certainly in the way we say that it squarely changed at all, is the fact that Arthur X itself applies this court law. It's a federal circuit decision. But it relies upon this circuit's precedent involving, essentially, the three factors from Edmund and how they can interbalance each other. And there, the federal circuit said, okay, if we just remove any restrictions on removability generally, that will solve the problem. That was the case that ultimately went up to the Supreme Court to be decided as Arthur X. And the government made the very same arguments that it's making here about all three factors taken together, the fact that removability should be sufficient as a remedy. And that was rejected by the Supreme Court. And, in fact, if anything, the Supreme Court, I think, threw some shade at things like removability, or at least what Chief Justice Roberts called them, the machinations that actually blur the lines of accountability, as opposed to just get to the heart of the matter, that if someone can make a decision that binds the executive branch, their superiors in the executive branch can't claim that their hands are tied, unless that person's a principal officer. And that's precisely what the committee authority can do here. If there are no further questions, I'll let you come forward. Do you want to take some time on the sentencing issues? Yes, just to reiterate, I think the fact that there were three novel charges in a novel criminal justice system, the central charge of which was thrown out by this court because it was not a crime, is more than sufficient to warrant a routine resentencing hearing. All right. What charge, what crime exactly was he being sentenced for? So he was sentenced for conspiracy, an inchoate conspiracy charge, solicitation, which is what the government described as its central charge in the prosecution. It was a conspiracy that resulted in the death of thousands of people, right? That's not correct. No, he was never charged with 9-11 or with any kind of responsibility for 9-11. And in fact, the government, in a pretrial proceeding, unilaterally, sui sponte moved to have language from the conspiracy charge saying that he engaged in an or as a person's mission, excuse me, of a terrorist attack. They moved to have that taken out of the charge sheet in order to, as they described it, lessen the offense. In any event, right now, we're deciding whether the commission, whether the review court, erred in saying that it could be pure of what the commission would have sent it back to the commission. Is that essentially what we're deciding? Yes, it's basically. Now, if you're saying this is too harsh a penalty, which you said in your briefs, you're saying this is too harsh a penalty, what do you think an appropriate penalty would be for being a part of the conspiracy that he was proven to be part of? Well, I don't know precisely what that would be. But if you're saying this one's too harsh, if your brief is accurately reflecting your argument on this, you must have some idea what would not be too harsh. What would be an appropriate sentence, counsel, for what he did? So all I can say is this is precisely why we have juries. But I would say look at the other sentences imposed by military juries in military commissions. There's not a single life sentence, including in cases involving an individual who was directly a participant in the bombing of nightclubs in Indonesia. The sentencing ranges in the military commissions have ranged from six months in the case of Hamdan to about 24 years in the case of Masyuk Khan, who was the individual responsible for the nightclub bombing. A lot of those cases also- So you don't have an answer to my question of what would be an appropriate sentence of this, or what a commission might have done that would have been appropriate? Well, I'm not going to speculate because Chapman tells us not to speculate. We have to be certain beyond a reasonable doubt what the members would have done, what the military jury would have done. So if I may, counsel, what is really striking to me about this resentencing is the existence of this findings worksheet, which you don't see, I've never seen before in a criminal case in which the jury or the military commission specifically checked off the objects of the conspiracy and the overt acts and found this petitioner guilty of murder of protected persons, attacking civilians, attacking civilian objects, murder in the violation of the law of war, destruction of property in violating the law of war, terrorism, providing material support for terrorism. And these are the exact same objects and also a bunch of overt acts as well, but they checked off the exact same things with respect to the two convictions that were vacated. And so it seems to me that this is as strong a record as you can have, that the vacator of the two other convictions didn't affect the sentencing because the jury has checked off the findings it relied upon to impose the sentence, and they're the same as the ones that were vacated. Well, I think if anything, that compromises the integrity of the jury verdict, precisely because we don't know if the jury put a particular weight on the government central charge, which was the solicitation charge, which it built its entire merits. But you're assuming that juries put weight on charges and not facts? I mean, the facts are the same. The evidence and the facts are the same. I mean, in my experience as a prosecutor, I don't remember a jury ever thinking about the charges versus the facts or the evidence. United States v. Tucker, the fact that the prior convictions had been vacated was sufficient to require resentencing in the subsequent prosecution, where the fact that the individual had been charged and convicted of multiple crimes was, in fact, sufficient basis to at least cast doubt on the ultimate verdict. It sort of depends on the facts of each case. And in this particular case, we have a worksheet that says the jury relied on the exact same overt acts and objects of the conspiracy. We're not saying that the finding of guilt is compromised by the vacater of the two charges. We're simply saying that when the government literally only mentions the conspiracy charge twice during the entirety of the sentencing hearing, and then only to emphasize that Mr. Avril had been convicted of multiple charges, when his entire theory of sentencing, and this is almost a direct quote, was that he made an ongoing solicitation that the members should sentence him to life so that he makes no more, then I'm forced to speculate about what the members would have done had the government brought the conspiracy prosecution, a single conspiracy prosecution, and attempted to establish Mr. Avril's culpability on that basis alone. I mean, except that the ongoing solicitations are overt acts in furtherance of the conspiracy. Right, but those are not criminal acts. Remember, an overt act is evidence of the conspiracy. The culpable conduct in a conspiracy is joining with others to commit crimes. And this specific conspiracy, I understand the charges are incredibly grave, but that's also true of all of the other conspiracies where the sentences have been far more disparate, and certainly nothing like a life sentence here. It's a fairly boilerplate charge, frankly, in Guantanamo. But again, the question is, do those overt acts prove his culpability for the conspiracy, or do those overt acts prove his culpability for solicitation? And the government made a very, very compelling, strong case that they established his culpability for solicitation, and then this court held that that conduct is not criminal. And so to the extent the government wants to... Sorry, I'm not tracking. Solicitation is an inchoate offense in the way conspiracy is, right? It's not just soliciting in the air. It's soliciting to commit a crime, just conspiring to commit a crime. So the object of the solicitation has to be criminal, no less than the object of the conspiracy, right? Right, but the conduct of solicitation is not criminal. And maybe I just wasn't speaking clearly, but to the extent... Maybe I missed it. Sure. So just because he's a bad guy is not a sufficient reason to sentence him to life imprisonment. He has to be sentenced on the basis of his culpable criminal conduct. And just as if he was an alcoholic or wasn't nice to his mother, those are not facts that are relevant in sentencing, just as the fact that he solicited members of Al-Qaeda is not a relevant fact to the proof of a conspiracy charge. I'm sorry. It seems to me that in sentencing, we take a broad view of what's relevant in terms of choosing an appropriate sentence. And the evidence that underlay the solicitation charge is still admissible as evidence in sentencing on a conspiracy charge. And there was a box checked on the findings worksheet that this defendant prepared and assisted in the preparation of various propaganda products. This is the solicitation. So the same evidence that the government relied upon to convict the petitioner of solicitation is still in the game. It still can be considered in choosing a sentence for a conspiracy. And it seems to me that because we have this findings worksheet, the jury checked off that evidence and could still properly consider it. And it seems to me that that's really difficult for you to overcome because that same evidence is still allowed to be considered. And it was considered or it can be considered in the analysis of whether, beyond a reasonable doubt, the vacater of those other two convictions of whether it affected the sentence. Where you have a set of evidence and facts, three different charges, two are vacated, but all the evidence is still in play. It seems to me difficult to say that the commission was not able to see that, was not able to properly consider that, and was not able to properly find beyond a reasonable doubt that the vacater of the two other convictions didn't affect the sentencing on the one. If I could just make two responses to that, Your Honor. I understand the intuition, particularly given this court's experience with the federal sentencing guidelines, because federal sentencing is very transparent. Each charge obtains an individual sentence. And that's simply done by formula, by the Sentencing Commission. Here is essentially just the discretion of the military jury. And for that reason, there are actually stricter rules with respect to sentencing evidence that go to the culpability of the accused in the military commission context, precisely because we don't know ultimately why or how a military jury makes a decision to sentence someone in one case of six months, in another case of life imprisonment. And so just on the admissibility question you raised, that's actually just a different rule that applies here. So can you explain this findings worksheet, how that would play into sentencing? This is sort of, I think, an unusual insight into what the military jury was thinking about. Well, it's that they found him guilty. And we don't dispute that they found him guilty of these particular facts. The question is what relevance. And this, again, is my second point, the relevance of those facts in his ultimate sentence and whether or not it's this. You think that a military jury would give more weight to evidence based on the charges that are before them versus just looking at the evidence and deciding what evidence is most relevant and probative? Well, we have to assume that military juries, just like regular juries, follow the instructions that they're given. When they're told to sentence an individual for three charges instead of one, and they're told to sentence him to life by the prosecutor so that he makes no more solicitation, we have to assume that that had an impact on the military jury. I think both of the sentencing witnesses in this case would not have had an impact. You compare it to federal sentencing. It's been upheld that federal sentencing can consider not only unproven but uncharged conduct. It's not part of the principal crime. As long as that's criminal conduct. And here the real issue is that. I don't think that's necessarily with the strict jury involved. Other wrongful conduct can be considered in federal sentencing. If it is criminal conduct. Other wrongful conduct. I carefully worded that to answer what you had just said. Okay. Does it have to be criminal conduct to be considered? You can't punish someone on the basis of criminal conduct. Does it have to be criminal conduct to be considered? We've cited a lot of circuits that have held that squarely. So I do think, yes, I do think it must be at least criminal in some context, even if it's unproven. Can you tell us where anybody has expressly held it or where we've expressly held it? Wrongful if not necessarily charged conduct. You can't sentence someone to a more severe sentence because they're a white supremacist or because they're an alcoholic or because they didn't. I understand you can't use those. All of that would be wrongful. I understand you can't use those specifics, but aren't there cases that say wrongful conduct as opposed to saying criminal conduct? But I do believe those cases say that the wrongful conduct has to be at least culpable and criminally culpable in terms of warranting. Can you give us a case? Yes, we've provided a string set of those cases in our reply brief. I can get the page for you on rebuttal if that would be helpful. But ultimately, if I just might put the second point, Your Honor, I know I've done vastly over my time, and I appreciate that. But to the extent there are facts in the record that might ultimately support the sentence, that shows that this case fails in a Chapman because the one thing we also know the government can't do is shoehorn various facts into a theory of culpability that is not presented to the members. That's the Supreme Court's decision in Chiarella. The military justice counterpart to that is a case called United States v. Swift. And under either circumstance, that's not an appropriate use of appellate authority, certainly. Okay, thanks very much. We'll give you time on rebuttal. Thank you very much. Ms. Tarrant? May it please the Court? Your Honor, a case that you could look to is the Winkleman case to support the proposition that even where convictions have been vacated, that the reassessing and reviewing court can consider all of the conduct in the record of trial where the remaining conviction is predicated on the same conduct as the vacated conviction, and that's a court of appeals for the Armed Forces case. This court reviews the CMCR's decision to reassess and reaffirm the sentence for an abuse of discretion, so this court could reverse if it concluded that the CMCR applied for a review. We review the threshold decision to reassess under Winkleman for abuse of discretion. We've already decided that. Exactly. The question of the Chapman determination, that has to be Danova. The question of once the CMCR reassesses the sentence? Whether the record shows beyond a reasonable doubt that the error was harmless. We would review that, Dana. And the CMCR applied the proper harmless error standard of review. The CMCR explicitly determined beyond a reasonable doubt that the panel of military commission members would have imposed a sentence of life imprisonment even absent the constitutional errors, and it also explicitly determined beyond a reasonable doubt that its reassessment rendered harmless any of the errors affecting the sentence. And the CMCR explained, as this court has previously recognized, that the remaining conviction for conspiracy to commit war crimes was predicated on the same conduct as the vacated convictions, and the panel of military commission members specifically found that, as overt facts to the conspiracy in which Bullo personally participated, that he was a personal secretary for public relations for bin Laden, that he pledged an oath of loyalty to bin Laden, that he also arranged similar oaths for two of the 9-11 hijackers, that he transcribed the pilot hijackers' martyr wills, and they also prepared these propaganda products, including the USS Colvideo, in order to recruit others to join al-Qaeda, and in order to recruit others to provide additional material support to al-Qaeda. The CMCR also recognized that, although Bullo didn't plead guilty at trial, at trial he did concede that he committed all of the charged conduct except for wearing a suicide belt, and in his allocution at the initial sentencing, he proudly boasted that his contributions to the conspiracy to commit murder with Osama bin Laden that culminated in the September 11th terrorist attacks were so valuable that bin Laden would not permit him to join the 9-11 hijackers. So we think that the CMCR did not abuse its discretion in reaffirming the sentence of life imprisonment, and we ask this court to affirm that decision. With regard to the remaining question about the convening authority, we think that there are two distinguishing factors between the convening authority in this case and the administrative patent judges in Arthrex. In the convening authority, unlike the administrative patent judges, the bulk of his or her decisions are reviewed by the CMCR, and just like the Supreme Court acknowledged in Edmund, the Court of Appeals for the Armed Forces reviews the decisions of the judges in the Coast Guard Criminal Court of Appeals. And then in Edmund, what the Supreme Court found significant, if not dispositive there, was that the judges couldn't render a final decision on behalf of the United States unless a superior executive officer could permit them to do so, like you explained, Your Honor, with respect to the removability provisions. And unlike the statutory scheme in Arthrex, where the PTO director can initiate inter partes review but can't actually adjudicate the proceedings himself, here the Secretary of Defense doesn't have to designate a convening authority at all. Instead, he can decide to fulfill that role himself. The decisions that are unreviewable, they're unreviewable only if she rules in one direction. Correct, Your Honor. If she grants an acquittal or reduces a sentence. Yes, Your Honor. And I had thought that was a very good fact for you. But if we think of the Appointments Clause as not only separation of powers in order to secure individual liberty but also creating lines of political accountability, that concern is present regardless of whether the ruling can help hurt the defendant. So why doesn't that at least move the needle a little bit against the government? Because as this Court explained already in Boval IV, the superior executive officer doesn't have to exercise total control. I'm sorry, doesn't? Does not have to exercise total control over the inferior officer to qualify as an inferior officer. And so just like in Edmond where the judge advocate general was still subject to unlawful command influence provisions and couldn't reverse the decisions of the judges, and even though the Court of Appeals for the Armed Forces could reverse the decisions of the judges, but its review was limited only to matters of law, the Supreme Court still explained in Edmond that that was sufficient to render the judges inferior officers. And we think that this Court's decision in Boval IV flowed directly from Edmond and in this much more analogous context in the military justice system. We don't think that anything in Arthrex called this Court's decision into question. Thank you. Thank you. I thank you for the additional time. Just a very few points. In response to your question before Judge Sentel, we put the screen site at reply brief, page 26 to 27, where culpable conduct must be criminally culpable, not just bad in some general way. I do want to emphasize two points here. It is black-letter law that sentencing courts, at least in the civilian context, sentencing courts have broad discretion to consider any facts that are relevant to the culpability, the offense or gravity of the offense or the culpability of the offender. Absolutely, and that's all we're asking for is an actual, correct interpretation of the law and the facts put before a military jury so that they can exercise their discretion to determine whether or not Mr. Albol should be sentenced to life or indeed life without parole. It's, I think, that simple. It's a routine, resentencing hearing is a pretty routine exercise, and why we're fighting it is not entirely clear to me. More specifically to a couple of points from Your Honor's questions dealing with the Appointments Clause, the explicit quote, the quote I was referring to before, Judge Penn as well, is the Supreme Court said that a, excuse me, I lost the thread on that. Oh, yes, sorry. The unreviewable authority to bind the executive branch is, quote, incompatible with an officer's appointment to an inferior office. The question with respect to standing. That's a far cry from saying this is the only thing we're looking at. There's two other factors under Edmund, and what you just quoted doesn't say that we look only to this finality factor and don't even look anymore to the other two. You can look to those factors, and we're not saying don't look to them. We're just simply saying that those factors must go to the reviewability of a particular decision. You're just saying incompatible. That's not very strong language. That's completely consistent with what the court said in Edmund. It is completely consistent with what the court held in Edmund, just not what this court held in saying that total control was not required, because what the Supreme Court says in Arthrex is that when it comes to a decision that binds the executive branch, control of that decision is what is required. So are you saying our prior decision was wrong under Edmund? Well, I think the Supreme Court's, I think, revised interpretation of Edmund in Arthrex. Again, the Supreme Court clarified that Edmund treated the unreviewability of a decision as a dispositive, sufficient factor to make someone a principal officer if their decision. Procedurally, where we are is that it has to be that Arthrex changed the law under Edmund, making our prior holding erroneous. Yes, and this court said we rely upon Edmund and our subsequent cases, which created this multi-factor balancing test. And the key in Arthrex is that the multi-factor balancing test is just no longer good law. Edmund is still good law, but the multi-factor balancing test that this court had developed is not. And just if I could answer Your Honor's question just about standing. I think even in the due process context, cases like Batson in Power v. Ohio do implicate situations where a defendant has the ability to object to the unconstitutional creation of the decision-making process that is ultimately going to lead to their conviction, even if, like in Powers, the defendant was white, has no, I believe it was even a white supremacist, has no sort of substantial right. Sorry, how is that? That's a third-party standing question. How is that relevant to this case? Well, I was just sort of pointing out the situations where even if it's not benefited, the unconstitutionality of the trial process does create the problem. No, no, no. The discrimination challenged in those cases harms the defendant. The problem is it's directed at the jury, so you need a theory. But the only reason it harms the defendant is because it makes the decision-making process unconstitutional. For the same reason the defendant can't use preemptory strikes in a discriminatory manner. And even if it's a white supremacist defendant, the government can't use preemptory strikes in a discriminatory manner. So that was really the only point I was making. But again, I do think the accountability point is ultimately the crucial one. The convening authority is able to act, do things as significant as remove the death penalty in the 9-11 case, and both the Secretary of Defense and the President can say, we had nothing to do with it, our hands are tied. And I think that's a significant decision, an important decision, and it should be entrusted to a principle officer. I understand. Any other questions? Thank you very much. The case is submitted.
judges: Katsas, Pan, Sentelle